the Currency. Mr. Berkshi for the petitioner, Ms. Nelson for the respondent. Mr. Berkshi for the respondent. May it please the Court. My name is Craig Berkshi and I represent the petitioner in this case, Mr. William Blanton. I'd like to reserve three minutes for rebuttal, please. With me today is my co-counsel, Ms. Mary Zinsner, and Mr. Blanton is also in the courtroom today. He made the trip to hear the argument. This afternoon we're asking the Court to review an agency decision, specifically a decision of the Office of the Comptroller of the Currency that entered a second-tier civil money penalty against Mr. Blanton, pursuant to 12 U.S.C. section 1818. Before addressing the substantive merits of the case, there is one threshold issue that I'd like to discuss and that involves the standard of review. The parties disagree regarding what is the standard of review in this case. It is the petitioner's position that the Court should adopt a de novo standard of review. The case below was decided on summary disposition, pursuant to 12 CFR section 1929A. That provision is identical in all material respects to Federal Rule of Civil Procedure 56. So there was no hearing in this case. The case was decided on the law and ostensibly on the undisputed facts. But this is an APA case. Yes, Your Honor. That makes it different from your standard summary judgment decision from the district court. Well, that is correct, Your Honor. The statute that is involved here is 5 U.S.C. section 706, and we believe the Court should apply subsection 2A, which provides that the Court should reverse agency action that is arbitrary, capricious, and abuse of discretion or not in accord with law. And the case that we were able to find that directly addressed this issue was actually a Fifth Circuit case, the Scott v. FDIC case. In that case, the FDIC brought a very similar type of enforcement action against a bank officer. Issues with respect to liability were decided entirely on summary disposition, and then a brief one-day hearing, evidentiary hearing, was held with respect to the penalty. In the Scott case, the Fifth Circuit held that the issues that were decided on summary disposition, in other words, the liability issues, were reviewed on a de novo basis, and that is, in fact, what the Fifth Circuit did. The issues that were decided after the evidentiary hearing with respect to the penalty, those got a more deferential standard of review, perhaps the one that you have referenced, Your Honor. I believe the government's position is the case should be decided under 5 U.S.C. 706. I hear what you're saying. I'm not sure I understand why, since it's an APA case, we would not review the agency's decision about whether there was a genuine issue of material fact here. That is, whether the case was appropriate for summary disposition or not for abuse of discretion, like we review every agency decision. I just don't, you know, I don't understand why we would do it that way. We wouldn't do it that way. Can you explain that? Yes, Your Honor. In this case, well, first of all, you would be reviewing a decision on summary disposition using the same standard as after an evidentiary hearing. And when agencies make, I understand the importance of deferring to an agency when there's been an opportunity to hear testimony from witnesses, to judge credibility. Those are the sorts of things that a trier of fact typically does. But in this case, that did not happen. The case was decided ostensibly on the basis of undisputed facts, and we contend that there were disputed facts. So if you review it using the more lenient standard of review, that issue effectively evades review, and nobody ever looks at it. So you mean, in inquiring whether there were disputed facts or not, we review that question, at least that narrow question of deciding whether there were disputed facts in the case? That's correct, Your Honor. Material disputed facts. That's correct, Your Honor. And, in fact, we would go one step further and say one of the main problems in this case was that the comptroller and the ALJ before the comptroller drew inferences based on facts that were in favor of the move-in, which they should not have done. There were a number of inferences that were drawn here that should have been drawn in favor of the non-move-in. So that would be another issue as well. You know, we decide so many APA cases for abuse of discretion where all the agency had before it was a record, I mean, a paper record. Isn't that true? I mean, I don't think our… That is true, Your Honor. So this case is the same. It's a paper record. Actually, it is not. And let me take you back to what's an older decision of this court. I apologize it was not cited in our brief. You know, preparing for oral argument often sharpens one's focus on the case law. This is Independent Bankers Association v. Board of Governors. It's a 1975 case that was decided by this court. And in that case, it actually involves rulemaking authority, I believe, so it's under Section 5, it's under 553. But there, there should have been a, the court reversed an agency decision where there was not a hearing and held the agency, however, carries a heavy burden of justification where Congress has plainly given interested parties the right to a full hearing. The agency must show that the parties could gain nothing thereby because they disputed none of the material facts upon which the agency's decision could rest. So this was a decision under the APA where the court said, no, you should have had a hearing because there were disputed issues of fact. That's 516 F. 2nd 1206. And I believe the Sebelius decision, Shirley v. Sebelius, which was also cited in our brief, goes along the same lines. In that case, the court, I believe, also held that, yeah, and this was cited in our brief under the standard review argument, specifically addressing the standard of review under 57062A. This court said, thus, we, as did the district court, must allow summary judgment for Apolis, in this case Sebelius, unless the appellants have produced in the record at least enough evidence for their position to establish a genuine dispute as to some material fact. So we believe that the Fifth Circuit's decision, which is squarely on point, is also in line with some of this court's decisions addressing review under the APA. And here, again, let me reiterate, I understand the importance of deferring to agency action when they have made a decision after an evidentiary hearing. And that's, most of the cases here, Your Honor, we had a hard time finding cases that were decided on summary disposition to cite to the court. That certainly makes sense because the agency has had an opportunity to see the witnesses, to judge their credibility, et cetera. Here, none of that happened. So... Before you move on, suppose, just suppose, this hypothetical question, suppose we don't agree with you and we think standard APA deference applies here. Does your case rise and fall on your de novo argument? In other words, can we read your brief as arguing in the alternative that if we don't agree with you that the agency's decision was an abuse of discretion? Yes, sir. Your Honor, we anticipated that and are prepared to argue on substantial evidence basis as well. And you think you argued that in the brief? Yes, Your Honor, we did. I know expressly we did. It was certainly not the main focus of the brief, but we did make the argument in the alternative because we anticipated that the court might view things differently than we did. And so, yes, under the substantial evidence test as well, this case should go back and there should be a hearing. Briefly, if I may, let me address the two other, sort of the two substantive issues in the case. The first is what we call the Campos Overdrafts. And here there are three main issues I want to address. The first is whether or not the case over to safe and unsound banking practice. The practice, the bank's practice of allowing the Campos Overdrafts went on for more than seven years, probably ten years, in fact. During that time, the bank never suffered a loss. Mr. Campos never failed to make good on his overdrafts. So empirically, there was no loss and no risk. Thus, and risk is, of course, part of the test of an unsafe and unsound banking practice. Secondly, the bank had in place controls that prevented any risk associated with the Campos Overdrafts from coming to fruition. Mr. Campos had multiple accounts. The bank would not honor an overdraft on any of those accounts unless there was enough money in the aggregate in the Campos accounts to cover the overdrafts. In effect, these overdrafts were secured by cash in the bank, the best form of collateral one could have. Well, when you say in the aggregate, does that include the accounts that he didn't even have signature authority for? That Mr. Campos did not have signature authority for? Correct. Yes, Your Honor. All of the Campos company accounts is what the testimony is. Well, how could those possibly be legitimately factored in to secure the bank? Because he couldn't transfer even with his permission. He doesn't have access to that money. Yeah. The Cheatham Affidavit addresses this. It's at page 298 in the record. And what it says is the bank had authority, both from Mr. Campos and his personnel, to transfer money between and among all of those considered part of the Campos accounts. So that would be page 298 of the record. Does he say it's the ones which Mr. Campos didn't have signature authority? How could Mr. Campos or his personnel give you authority over that? I don't understand that. The personnel who had authority over the accounts. I can read the affidavit that specifically. Is it that specific? You read it that specifically? Well, it was, as a matter of fact, it was done, and it was done with the acquiescence of the holders of the accounts for more than 10 years. So from that and from that lengthy course of dealing, I would infer that there was authority. In fact, at a trial, that evidence would be very important, that there was a 10-year course of authority of moving money between these accounts without any objection, without problem. So I don't think that authority was ever an issue, but in any event. We also have testimony from Mr. Cheatham here. Mr. Cheatham was the bank's attorney. He gave hybrid fact expert testimony in which he testified that this was a safe and sound policy and was not an unsafe and unsound policy. So, I mean, it can certainly be unsafe and unsound even if the risk hasn't come to fruition, right? I mean, there's obviously, there can be a need to act against a risk that could come to fruition, even if it turns out that it didn't. Yeah. We have to be careful in going too far down that road because one tends to then conflate consequences with risk. So by analogy. I mean, I guess I'm making the opposite point, that I wouldn't want to conflate happenstance beneficial consequences with lack of risk. Yeah. A point that we made in our brief, if one safely crosses a bridge every day for 10 years, that says something about the risks associated with crossing the bridge. The fact that this went on for 10 years, one could hardly say was happenstance. In fact, Mr. Campos made good on a $5 million overdraft in 2003. So the overdrafts that were taking place in July and August of 2010, when Mr. Blanton was the interim CEO, were minuscule by comparison. So I'm not necessarily saying this is or isn't happenstance. I guess I'm just making a broader conceptual point, which is that the fact that the overdrafts may have been made good on doesn't necessarily show that it was a sound and safe practice to permit this to go on. It could still be an unsound and unsafe practice. I would look at it a little differently. On summary disposition and depending on which standard of review you apply, the argument I would make is the inference should be drawn in favor of the non-movement, and so Mr. Blanton should have received the benefit of the doubt that a 10-year history of overdrafts always being covered leads one to the conclusion that they would continue to be covered. And, in fact, that is what happened. Do you think the amount of the overdrafts should matter? Excuse me? Do you think the amount of the overdrafts should factor in? No, I do not. Because once you start looking at the amount of the overdrafts, you're now conflating consequences and risk. So, by analogy, falling from 30,000 feet results in certain death, but we consider it an acceptable risk to be at 30,000 feet when we're in a commercial airliner. Same situation here. Any one of these overdrafts might well have put the bank into the red, but the fact that we have controls around the overdrafts, meaning the bank does not honor one unless there's cash on deposit in the bank, and we have a 10-year history of the overdrafts always being covered means you have no risk. It's like being in a commercial airliner. So, briefly, I see that my time is running out. I just want to briefly touch on the final issue in the case, and that is the H and H and Brooks Avenue loans. One of the arguments that the government makes is that Mr. Blanton's view that the call reports were correctly stated, accurately stated, was objectively unreasonable. The statute he's alleged to have violated, 12 U.S.C. 161, is not a strict liability statute. He had advice from his CFO, who was an accountant. He had advice from his outside auditor, who is a CPA, in writing, taking the position that it was appropriate for the write-downs of these loans to be reversed and that the call reports were accurate. In fact, his CFO even signed the call reports testifying to his belief that it was accurate. If his belief was that those call reports were accurate, then Mr. Blanton's belief was as well. I see my time is out. Thank you. Thank you. May it please the Court. My name is Amber Melton, and I represent the comptroller of the currency. Your Honors, this is a straightforward case of a banker with misplaced certainty in his own opinions, causing him to disregard the reality surrounding the bank, guidance from the OCC, and advice from the bank's external auditor when it was inconsistent with the petitioner's own opinions. With respect to the call reports, petitioner states that the OCC did not have a proper basis to direct the loan charge-offs, but the undisputed facts show that the bank, the OCC, and petitioner initially agreed that the loan should be charged off, that the criticized asset reports which supported the loan charge-offs in this case acknowledged that the guarantor's financial resources were insufficient to prevent the charge-offs, that the guarantors were not making principal payments on the loans, or they were having a non-party to the loan agreements making payments on the loans, despite entering into several loan modification agreements that relaxed these loan charge-offs, that the OCC and the bank's external auditor either ex- Are we, are we review, what's your view about how we review what you're telling us about the record here? Are we, counsel for petitioner says it's clearly de novo, because it's a, the question is, it was all decided on summary disposition. Your Honor, I, your Honor, the APA standard of review applies here, the substantial evidence test. Well, that's stating the conclusion. Why is that? Well, your Honor, first, within the, within the enforcement penalties, within the enforcement statute of 12 U.S.C. 1818H, it says that the APA standard of review applies to enforcement proceedings, review of enforcement proceedings. Further, the Fifth Circuit in Scott v. FDIC, a case cited by both the OCC and by petitioners, the court applied the substantial evidence test to the substantive ruling in that case. In that case, it was a reg O violation, and the court specifically stated when addressing the reg O violation was whether or not substantial evidence supported the findings by the board of the FDIC in that case. So, in this case, his argument is you have chosen to adopt a regulation that says, we're going to follow the summary judgment standard. We're going, in deciding whether to do summary disposition, not looking at the substance of your decision, but in deciding whether to do a summary disposition or to give him a hearing where he can come forward and try to put on his case, we're going to follow the summary judgment standard. Now, in deciding whether there are disputed material facts or reasonable inferences that were not taken in his favor, don't we review that narrow question de novo? Because if you have violated that, then you have engaged in arbitrary enforcement of your own regulation. Well, Your Honor, if ultimately the court can look to whether or not there are actually any disputed facts, but, however, whether or not the court should apply the substantial evidence test, seeing that whether or not the OCC or the comptroller in this case had substantial evidence to support its decision, that standard should still be applicable. And that was the standard. I'm still going to back up. Let's see. You agree that under your own regulations, I take it, that to do the summary disposition you did here, you had to take all the evidence in the light most favorable to him and not rely on disputed material facts or ignore reasonable inferences in his behavior. That's what your summary judgment regulation means, correct? The summary judgment regulation does follow the summary disposition regulation, yes. Okay. So when we're trying to review just that narrow question of whether looking at this record, not whether you could have had substantial evidence on a record like this after a hearing, but whether you actually complied with that or there were disputed material facts or reasonable inferences not given to him, when we undertake that review of the record, how do we do that? Do we go forward deferentially? I believe it would still be the deferential standard would apply. And, yes, you do. I believe the court can review whether or not there were any. Well, one, the summary judgment standard also says that evidence that is of insufficient caliber or quantity does not have to be considered in determining the summary judgment rule. I get all the summary judgment standards. So I'm asking you how we review whether you complied with that standard in this case. And I thought you just said we should be deferential in doing that, which has my head kind of spinning because I'm trying to figure out how I deferentially determine whether there were disputed material facts or you took all reasonable inferences in his favor. How do I do that? So does that mean if there were disputed material facts, you still get some leash on that? No, I believe that if there are any disputes of material fact that are material to the determination, then the court would have to consider that. Consider that. Then that would mean you were improperly engaged in summary disposition here. Is that correct? Yes, I think the court ultimately could determine that there were genuine disputes as to material fact. However, what constitutes the material fact and whether or not there's a genuine dispute of material fact, again, is determined by the substantive law, and it's also determined by the substantive law. Here, the substantive law with respect to the overdrafts show that large and uncontrollable overdrafts are unsafe or unsound practice. And with respect to the call reports, it says that the bank is obligated to file. The record also shows that OCC knew about this for at least eight years, dropped its own investigation into these overdrafts in 2003, raised the issue with Mr. Blanton even when he came on board. Two months, May-June went by without OCC doing anything. Isn't that a reasonable inference in his favor that maybe under all the circumstances of this case and all the history of these overdrafts being honored and the fact that if they slammed down quickly on Mr. Campos, he would take all his money out and the entire bank would fail, that under all those circumstances, maybe it was the less unsafe and unsound alternative that Mr. Blanton had at the time? I believe that the inference here was proper because I don't think that Mr. Blanton points to the fact that the OCC, that it didn't take the same approach in previous years with respect to the overdrafts. However, the bank was in a different position in 2003 in the years preceding Mr. Blanton's tenure as NRM CEO. Again, at the time- What position was the bank in the year before he took over that was different from the one he did take over? Well, Your Honor, at least with respect to the year before, the bank, I believe it was in 2009 when the bank was rated a five bank, where it was deemed critically undercapitalized. However, the controls that Mr. Blanton points to, the 2003 controls, they were implemented at a time where a bank was in a different financial condition. At that time- But they were still doing the same overdrafts. I'm sorry? This overdraft policy was going on for at least eight years before he came on the scene, correct? Yes. Is that disputed? Yes. That's not disputed. And OCC didn't at least turn an eye to or didn't react in the way it did with Mr. Blanton. It kind of acquiesced or tolerated these things for quite some time. Is that true? Or is that a reasonable inference a decision-maker could make? Well, I think the concern regarding the overdrafts was heightened in 2010, and that's because of the state of the bank in 2010. Well, but that was the state he came into, so it was already in that state before he came to the helm of it, right? Correct, Your Honor. Okay. So I guess I'm still back to if we're talking about reasonable inferences on a summary judgment, and that's your choice of a regulation. That's your choice of a regulation to have that. And he says there could be testimony that would say that if they had come down hard on Campos really fast, he would have yanked all his money out and crashed the entire bank down quickly. And so Mr. Blanton was working on it slowly over this four-month period. Doesn't that raise a question about whether that was unsafe to take the time to try to find a way to impose further controls that would allow more regulation of these overdrafts without dragging Mr. Campos and all his money out of the bank? And, yeah, so we keep the status quo just because we've got to keep treading water here until we can actually put together something that's going to work. Well, Your Honor, I think here the unsafe or unsound practice here, the risk posed here, the undue risk here was that the overdrafts in this case amounted to over $400,000. At times, while Petitioner was interim CEO, they at times amounted to over $430,000, approximately 65 percent of the bank's Tier 1 capital. But that was going on before. Like huge percentages were going on all the way back to 2003. So this is all about not whether a decision like this, if you didn't have this summary judgment rule, would meet substantial evidence. It's about whether what happened here meets that substantial evidence standard. I'm also just not quite sure what action is it that Mr. Blanton did. I think you say it's the failure to stop these overdrafts when he came on board. Because he wasn't actually the one signing and authorizing the overdrafts, but he got an email, I guess, in late June and said, do you want to continue this? And he said, we'll continue it while I'm working on this solution. So was it his policy of allowing these? Is that what his unsafe practice was? Correct, Your Honor. As the record reflects, in March 2010 and April 2010 and May 2010, Mr. Blanton told the OCC that he would get the overdrafts out of the bank or that he would implement the additional controls. However, the record also shows that as of July 20, 2010, the bank's practice was, or its policy was, to pay for everything. And that was a continuation of the policy he had adopted in June, at least in response to the email. Yeah, well, yes, but simultaneously he was telling the OCC that he would get the overdrafts out of the bank or that he would implement additional controls. Sure, but is that supposed to happen? It's been going on for eight years, so he was taking them, he assigned them. There doesn't seem to be a dispute that he tasked Mr. Beal with this job and that Mr. Beal was doing it within, I don't know, a month or so of that task. He had an outline of conditions and was meeting with Mr. Campos about it. So, again, these are all about inferences from the evidence, which I'm having trouble reconciling with your summary judgment standard. Well, Your Honor, I think that, again, the surroundings of the bank, what was going on, its capital levels are very important. In 2003, there were overdrafts of millions of dollars in uncollected balances with respect to the Campos accounts. I'm talking about 2009, 2008, even the first half of the year of 2010. The evidence on the record is specific to the 2003 period and the 2010 period with respect to when Mr. Blanton was at the bank, CEO of the bank. However, in 2003, there was an uncollected balance of millions of dollars. And in the email from the OCC examiner in August 2003, it says that even if the bank were to lose on those uncollected balance, capital levels would have still been adequate. However, in 2010, $430,000 worth of uncollected overdrafts could have taken the bank. When did the bank come into this condition where it could no longer tolerate these overdrafts? When did the overdrafts become unsafe and unsound under your theory of the record? It would have at least been clear at the time that the OCC conveyed to the bank that it was an unsafe or unsound practice. Again, the OCC told Petitioner on several— When was that? That was when? It was—the record reflects that Petitioner told the OCC as early as March 2010 that he was taking care of the overdraft issues, that it was close to a resolution, and that he would get the loans— But he wasn't even a CEO in March. He was— Maybe the last day of March 2010, right? He was a director of—he was on the board of directors of the bank. He did assume the position of CEO in April— Right, so he was pushing Mr. Froman out, so he was taking some steps to try to deal with this situation. However, at the time that he came back—at the time that he did assume the position of interim CEO, he did not address the overdrafts in the way that he was telling the OCC that he was. It sounds like—I guess this somewhat relates to the statute of limitations issue. It sounds like the problems were that he, I think as you said, adopted this policy of allowing the overdrafts in June 2010 in response to an email. And after that, other folks just implemented it. So how is that not a situation of attaching responsibility to the effects of an act rather than the act itself? What you had from July on were the effects of his policy decision in June, not him making a new decision each time every overdraft came in. Well, Your Honor, with respect to when the statute of limitations began to run, you have to look at that second prong of the CMP statute, which means that it's part of a pattern of misconduct here. Every time he allowed these overdrafts to continue throughout July, throughout August, and throughout September 2010 while he was interim CEO, he could have put these—implemented these additional controls, or he could have stopped the overdraft activity as he was conveying to the OCC. So every time he failed to implement those controls or stop those overdrafts, there was an unsafe or unsound practice for the purposes of the statute of limitations beginning to run. Well, when we have continuing violations,  and a bad act that has forward-going effects, and if the bad act was his decision in June to, in response to that email, to say, go ahead and do the overdrafts until I'm getting something in place, but until then, go ahead and do the overdrafts consistent with the 2003 controls, that was June. And after that, you just have the effects going forward. Your Honor, I think, again, an unsafe or unsound practice can be an act or a failure to act. And I think in July and August and September of 2010, he failed to implement these additional controls or stop the overdraft activity, despite telling the OCC that he was doing so. And then even Mr. Beal, within days after Petitioner stepped down as interim CEO, he implemented the additional controls via email. And he also—Mr. Beal also, within weeks of implementing these additional controls, actually told Mr. Campos to stop the overdraft activity. So that shows that Petitioner could have implemented these controls as he was telling the OCC, or he could have stopped this overdraft activity during his tenure as interim CEO. As he told the OCC, he just did not, even though there was reasonably foreseeable undue risk associated with these overdrafts. I just have two—I'm sorry, were you done with your morning questions? Go ahead with that. So I have two questions for you. One is the opposite of what I asked counsel for Petitioner. If you're wrong about our standard of review, if this is just like summary judgment, can you prevail? I mean, can we review this de novo and still conclude there's no genuine issue of material fact? Your Honor, yes, because, you know, there are—based on the undisputed material facts on the record, with respect to the loan charge-offs, the OCC properly directed the loan charge-offs. And even with respect to the loan charge-offs, even under the Sunshine Bank standard, BFDIC, deference is owed to the examiner's conclusions with respect to loan classifications. And then with respect to the overdrafts, it's undisputed that the bank was critically undercapitalized and on the verge of collapse at the time that Petitioner was CEO, that the overdrafts at times amounted to over $430,000, 65% of the bank's tier one capital, which is the bank's core capital to insulate it against losses, and that the OCC warned Petitioner on several occasions of the risk associated with the overdraft. And Petitioner told the OCC that he would either get the overdrafts out of the bank or he would implement additional controls. Petitioner never made good on any of those assurances to the OCC. So based on that undisputed record, we believe that the OCC's determination that there was a violation of law and that there was an unsafe or unsound practice with respect to the overdraft should be affirmed. My second question was unrelated. I was going to go to the properties. Oh, okay. So my unrelated question is, so the comptroller says in the decision that each of these problems, each, the overdrafts and the inaccurate call reports, says each provide an independent basis to impose a CMP far beyond $10K. Does that mean that we only have to sustain one of these? Yes, Your Honor. Well, you didn't say that in your brief. I'm curious about that. So your view then is if we think, if we sustain the comptroller on the overdrafts, we don't have to even consider the call reports? Well, Your Honor, below we did say that each. I know you said, that's what I just read to you, but I'm asking you what we're supposed to do. Your Honor, yes. I think if the court were to come down that it agreed with the OCC on one issue and not the other, that the penalty could still, the penalty should be stayed in this case, or it should still be applied. Why does the agency do this? I saw that too, and I thought if there's more than one violation, why is it that the agency would say that we're at a flat amount, regardless of whether you have one or two? I'm sorry? Why would the, does the agency typically do this, that if there's multiple violations it doesn't add anything new for a different violation? That it says, well, the first violation is worth $10,000 alone. There's a second one too, but we're not going to add anything to that. It's still $10,000. I believe below that there was a hearing on the appropriateness of the CMP, and there was a stipulation that $10,000 would be our appropriate amount. However, in the briefs below, we did say that the penalty that the agency could impose with respect to the violation and the unsafe or unsound practice could have been millions of dollars. So was that stipulation that that would be the right amount if there were only the one violation and not the call-to-court violations, or was that stipulation that that was the right amount for the collective violations found by the comptroller? I think the stipulation was whether or not $10,000 would be appropriate as to both the unsafe or unsound practice or violation of law. However, again, the agency below said that the CMP that it imposed or the penalty that it imposed would be sufficient for either the violation of law or the unsafe or unsound practice, and the petitioner doesn't dispute that determination in this court. Wouldn't we still have to, since you're talking about agency deference here, wouldn't we still have to send it back for the comptroller to decide what should be done if there's only one violation? Again, because the comptroller below said that there was an independent basis to impose for either the call report issue or for the unsafe or unsound practice related to the overdrafts, and each provided an independent basis for the $10,000 CMP that you would not have to remand this to the comptroller below. Did the OCC, with respect to the call reports, where did the OCC specifically tell Blanton that if the original write-downs were in error? Let's just assume. I know that OCC didn't agree with this, but assume that those original write-downs were in error. Did OCC say that regardless of whether they're in error, you cannot write them down, or did it just disagree about whether they were in error? Your Honor, there's no evidence in the record that the OCC specifically said that if there was an error that it couldn't be amended. However, in this case, the OCC told Petitioner specifically that it would be inappropriate, that it wouldn't be an acceptable accounting practice to write up these loans after they've been written off, and then they also told them that they didn't agree with the view of the bank's outside auditor, Auditor and Sarah. And the call report instructions, which are applied to the way the call reports are reported, specifically says that when the OCC's interpretation of GAAP conflicts with that of the bank, the OCC's interpretation should be applied. Yeah, but the statute says you only get to do that if your interpretation is no less stringent than GAAP, correct? Yes. And so your handbook can't be doing anything more than what the statute says, correct? The call report instructions can be no less stringent than GAAP. No less stringent, so that has to capture that same idea. It seems to me far from self-evident that a requirement that you not adjust write-downs that were taken in error is more stringent than GAAP. That seems to me to be tolerating an error. In this case, you think it might be more protective. In lots of cases, it could be less protective. So I don't understand how that instruction, if it's interpreted, to apply to an erroneous write-down would satisfy the statute. Well, Your Honor, here the more conservative position would be not to rebook the loans. In this particular case? Yes. Right, but that can't be. You're saying the instruction was in the instruction manual, not a case-specific one, and I don't know that that's more protective or more stringent to perpetuate errors. I can imagine lots of situations where telling a bank to perpetuate an error would be less stringent than GAAP and very tolerable. Well, Your Honor, again, the call report instruction says the OCC interpretation of GAAP should be reported in the call report, and here in this case, the OCC told Mr. Blanton of their interpretation of GAAP of whether or not this would be an acceptable accounting practice. And also the record also shows that Mr. Blanton never attempted to reconcile these differences with the OCC. Mr. Blanton makes the argument that the OCC examiners are not CPAs and that they're not entitled to deference with respect to their decisions of accounting principles. However, the record also shows that the examiner, Karen Hudson, said that if Mr. Blanton would have been the prudent and appropriate thing and came to the OCC with his differences, particularly if the bank's external auditor had a different position than the OCC, they would have gotten the OCC CPAs involved. Also, it's also undisputed that the CPA expressed reservations with respect to the write-downs. He said that you have to convince the OCC of your position with respect to rebooking the loans, or else you cannot recover that amount until you receive cash. And Mr. Blanton's deposition testimony said upon receiving this email that this email prompted him to become livid and that he was upset that Mr. Ancero was backpedaling on this issue. And Mr. Ancero's deposition testimony also says that he made the bank aware, he made petitioners specifically aware of his position with respect to rebooking the loans and that you have to convince the OCC of your position at the time that he gave this advice. And also, the auditor in Sarah's deposition testimony says that the bank never even informed him that he was rebooking the loans, and they never provided the additional information that he needed to support rebooking the loans. So with all that in mind, I think it shows that that petitioner wanted these loans to be rebooked because he wanted to put $3 million back on the bank's books, but not necessarily because it was an acceptable accounting practice. And that when his experts, specifically the bank's outside auditor, agreed with his position, he was fine with using that position as a basis to support the rebooking of the loans. But when he disagreed with that position, that he still rebooked the loans anyway and caused the bank to file the amended call rewards. Anything else? Okay. Thank you. Okay. Your Honors, for the reasons stated here, we ask that the petition for review be denied. Thank you. Thank you. Counsel is out of time, right? You can take two minutes. Thank you, Your Honor. Yeah, go ahead. Your Honor, you're right. The standard of review is the critical issue in this case. And one thing I want to address before I move on to the substantive merits is that Scott versus FDIC decision. Counsel for the OCC says that in that case, the Fifth Circuit applied that deferential standard of review, and that is just an incorrect reading of the case. I've got the Scott decision here. And in this case, the Fifth Circuit expressly says, excuse me, the FDIC standard for summary disposition is similar to the standard for summary judgment. Consequently, we review a grant of summary disposition as if it were a grant of summary judgment. Then, at the very conclusion of the opinion, the court says, after reviewing the record, we agree with the ALJ that petitioners did not dispute of material fact. The last sentence of the opinion, thus, the ALJ did not improperly resolve contested factual issues. So I understand that it is the Fifth Circuit, and it's only persuasive precedent here. No, it's not even persuasive there, right, because it's unpublished. That is correct. It is persuasive there. That's exactly right. It's not persuasive there. I'm sorry. It's only persuasive there. It's not binding there. That's exactly right, of course. Yes, thank you, Your Honor. The next issue I want to address, because I'm running very low on time, let me just briefly say, with respect to the loans and the charge-off of those loans, the OCC never instructed Mr. Blanton that those write-offs were improper. Not in the May 23rd, 24th email. Not in the July 15th or 13th emails. And not in the July 27 emails. And with the small amount of time I have left, let me just say, it's been an honor arguing in front of this Court. This is my first time. Thank you. Can I just ask you on the August 18th email? Excuse me? The August 18th email. Didn't that say that? There was an August 15th letter that, oh, you're talking about Ms. Carruthers' email to the bank. So the August 18th email came after all of the call reports at issue in this case were already sent. So the second quarter call report went out on July 30th, so the August 18th email obviously post-dated that. And then the other call reports, the amended call reports for fourth quarter of 2009, first quarter of 2010, and second quarter of 2010, were filed, I believe, on August 15th. So that instruction in the August 18th email, the chronology is out of whack. To the extent that email contains instructions, it post-dates when the operative events upon which the violation is based occurred. Going back to the previous point you made, did the petitioner ever get the agency's position to rebook the loans and file the amended call report? I didn't see that anywhere in the record. You're talking about the July 15th email? No, I'm talking about the rebooking of the loans. That was never approved by the agency, correct? It was never approved, but it was never disallowed. But it was never approved, right? It was an amended call report, rebooking it, that was not approved, correct? I don't know if they were. Well, I ask you the question because the instructions make clear that the agency has to approve the filing of an amended call report. That didn't happen here, correct? I do not believe that's in the record one way or another, Your Honor, I don't know. No, well, can you tell me where in the record there is evidence that the agency approved the filing of the amended call report, rebooking the loan? Where is that in the record? I don't believe that the record speaks to that, Your Honor. Well, then doesn't that suggest that it wasn't approved? And doesn't that mean that the instructions regarding filing amended call reports were violated? Well, there was no disapproval of the filing prior. You agree that the call report instructions require the approval of an amended call report, right? That's what the instructions require. I'm sorry, Your Honor, I don't know where that is in the record. I don't know if it's required or not. Okay, all right. Well, thank you very much. Thank you. Both of you, the case is submitted.
judges: Tatel, Srinivasan, Millett